**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

KEVIN DALE MARTIN,                         No. 2:08-CV-1578-WBS-CMK-P

    Plaintiff,

  vs.                                                  FINDINGS AND RECOMMENDATIONS

McNUT, et al.,

    Defendants.

_____/

       Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is defendants' motion for summary judgment (Doc. 54).

**I. BACKGROUND**

    **A.**    **Plaintiff's Allegations**

       This action proceeds on plaintiff's amended complaint (Doc. 23) against defendants McNut. Roche, Wooten, Riley, Reichert, and Pomazal. Plaintiff alleged denial of medical treatment following exposure to Roundup weed killer. He states that defendant McNut sprayed him with the weed killer while he sat handcuffed to a fence. He was allowed to shower

1

and told that medical treatment would be provided. According to plaintiff, however, no treatment was provided other than an x-ray. He claims that the remaining defendants each denied or delayed necessary medical care.

  **B.**   **The Parties' Evidence**

    Based on their own declarations, as well as portions of plaintiff's medical records and prison file, defendants assert that the following facts are undisputed:

    1. At all relevant times, plaintiff was (and currently is) a state prisoner incarcerated at California Correctional Center ("CCC"), defendant McNut was a groundskeeper at CCC, defendant Riley was a correctional officer at CCC, defendant Pomazal was the chief medical officer at CCC, defendant Reichert was a physician assistant clinician at CCC, defendant Roche was a physician at CCC, and defendant Wooten was a nurse at CCC.

    2. As part of his weed abatement duties, McNut utilized a spraying trailer with a 200-gallon tank of Roundup weed killer.

    3. According to safety documentation supplied by the manufacturer, exposure to Roundup does not pose a health threat more serious than exposure to any other common household chemical; the safety information also indicates that there is no occupational safety hazard associated with normal use of the product, and no special safety equipment was needed.

    4. On July 31, 2006, McNut was performing regular weed abatement duties on Yard 3 at CCC; while inmates were on the yard at the same time, none were in the immediate vicinity of McNutt's spraying activities.

    5. At the same time McNut was spraying, a fight broke out among inmates on the yard; inmates were ordered to get down on the ground and, after they did not comply, pepper spray was released into the air to subdue the inmates; correctional officers then ordered inmates to sit along the fence line near the location McNut was spraying Roundup as part of his weed abatement duties.

    6. To avoid exposing inmates to Roundup, McNut adjusted the spray nozzle to reduce the amount of Roundup coming out of the nozzle; he also pointed the nozzle more towards the ground.

7. During the time McNut was spraying along the fence no inmate complained that they were being sprayed; as a result, McNut never filed any incident report and did not learn that any inmate had complained about the situation until October 10, 2006, when plaintiff filed an inmate grievance alleging lung and sinus damage, as well as disabling breathing problems, as a result of exposure to Roundup.

8. McNut never intended to expose any inmate to Roundup, and he took reasonable steps to ensure that exposure did not occur.

9. Defendant Wooten learned that plaintiff had complained about exposure to Roundup while making normal rounds on August 2, 2006, at which time Wooten escorted plaintiff to the medical clinic.

10. Defendant Riley obtained a copy of the Roundup safety information sheet and brought it to the medical clinic on August 2, 2006.

11. Defendant Roche saw plaintiff on August 2, 2006; at that time plaintiff complained that he had been exposed to Roundup on July 31, 2006, and that he suffered from coughing, shortness of breath, headaches, nausea, and feeling "blah"; plaintiff also stated that, after the exposure to the Roundup, he had been permitted to shower within four to five hours; Roche noted that plaintiff had a history of seasonal allergies.

12. In passing, Wooten shared his personal experience with Roche that Roundup was not a toxic chemical that posed any long-term danger; Wooten did not intend by this comment to suggest that plaintiff should not receive medical treatment and it was not Wooten's intent to interfere with medical treatment.

13. Roche conducted a medical evaluation and noted that plaintiff had supple nodes and his lungs sounded clear; Roche ordered a chest x-ray, completed that say day – August 2, 2006 – showed normal results; Roche prescribed an Albuterol inhaler, as well as Albuterol and Ipratropium breathing treatments; the doctor also renewed plaintiff's prescriptions for allergy medications.

14. Roche evaluated plaintiff again on August 23, 2006; at this appointment, plaintiff complained of sinus problems as a result of the July 31, 2006, Roundup exposure; Roche's examination revealed clear nasal mucus with no polyps or discharge; plaintiff's frontal and maxillary sinuses were not

tender to palpation and percussion; plaintiff's lungs were clear and showed no rales; Roche determined that there was no medical need for further treatment; as to plaintiff's allegation that Roche refused to prescribe him Zyrtec at this visit, which had been prescribed previously but which is not a prison-approved drug, Roche instead prescribed Loradatine, which has the same benefits and uses as Zyrtec, and which is a drug approved by the prison.

15. Defendant Pomazal, in his role as chief medical officer at CCC, reviewed plaintiff's October 10, 2006, inmate grievance on December 4, 2006.

16. In his grievance, plaintiff requested assignment to the disability placement program, alleging that the Roundup exposure had caused disabling breathing problems; plaintiff claimed that his condition met the requirements under the Americans with Disabilities Act ("ADA").

17. Based on plaintiff's medical records, Pomazal determined that plaintiff did not suffer from any condition that impacted his ability to be mobile, hear, see, or speak – the requirements for the disability placement program.

18. Defendant Roche examined plaintiff on December 13, 2006, in connection with his appeal of Pomazal's first level decision on his inmate grievance; as with Pomazal, Roche could not confirm a disability.

19. Plaintiff's inmate grievance was denied at the director's level on April 6, 2007.

20. Plaintiff filed another grievance on April 25, 2007, demanding a copy of his entire medical file as well as an accident report from the July 31, 2006, incident; in a May 2, 2007, informal response, plaintiff was informed that he was third in line to receive a copy of his medical file.

21. Plaintiff appealed to the next level of administrative review and was informed that: (a) his file would be produced; and (b) no incident report had been prepared because McNutt was not aware of any incident.

22. Plaintiff appealed to the next level and was provided a copy of the Roundup safety information.

23. Plaintiff next appealed to the director's level of review; in a September 29, 2007, decision plaintiff's appeal was denied.

///

4

18. In a third appeal, filed on May 27, 2007 – while the second appeal was still pending – plaintiff claimed that he had not been receiving adequate medical treatment for his breathing and sinus problems.

24. Plaintiff was interviewed by Jones, a prison nurse, on July 19, 2007, in connection with his appeal.

25. In addressing plaintiff's third appeal at the second level, Pomazal responded to each of plaintiff's five complaints on August 28, 2007; Pomazal noted that, since plaintiff had arrived at CCC in December 2005, he had received 39 medical appointments, six speciality services appointments, 19 diagnostic tests, and three additional procedures were pending medical authorization review; the doctor also noted that plaintiff had been receiving constant treatment for his medical complaints, including surgical hernia repair, treatment for hepatitis C, treatment for esophageal reflux disease, and treatment for hay fever and asthma; plaintiff had also been examined twice in connection with his requests for disability status.

26. Plaintiff's third appeal was denied at the director's level on December 4, 2007.

27. Plaintiff filed a fourth inmate appeal on May 14, 2008, again claiming that he was receiving inadequate medical treatment; specifically, he stated that he was overdue for diagnostic testing of his lungs.

28. A prison nurse interviewed plaintiff in connection with this appeal on July 14, 2008, and noted that plaintiff continued to have regularly scheduled follow-up appointments; plaintiff showed no respiratory distress during the interview and had an oxygen saturation level of 97%, which was within normal limits; plaintiff had been provided a daily nebulizer treatment as needed and had been seen in the medical clinic on a regular basis for treatments and oxygen saturation level testing; the medical clinic confirmed that plaintiff was being provided medication as well.

29. Plaintiff pursued his fourth appeal to the next level and received a response from Pomazal on August 20, 2008; Pomazal noted that plaintiff had a sleep study performed on August 13, 2008, and that he was scheduled for an appointment with the pulmonologist to have a CPAP machine set.

/ / /

30. Plaintiff appealed further and received a director's level decision on September 28, 2009; the decision noted that, from April through August 2009 plaintiff had been examined by his primary care providers 17 times, medications were ordered and adjusted as necessary, diagnostic tests were performed, and plaintiff was provided education regarding his medical conditions; it was confirmed on September 14, 2008, that plaintiff in fact had a CPAP machine in his cell.

31. Plaintiff filed a fifth inmate appeal, also on May 14, 2008 (the same day he filed his fourth grievance), demanding that all references to childhood asthma be deleted from his medical file; defendant Reichert met with plaintiff in connection with this appeal on June 2, 2008, and informed plaintiff that information in his medical file could not be changed and that plaintiff himself had stated that he had childhood asthma.

32. Plaintiff pursued his fifth grievance further and received a second level response on September 2, 2008, by Pomazal, who concurred with the prior decisions; plaintiff's fifth grievance was ultimately denied at the director's level of review.

In his opposition, plaintiff provides the signatures of eight people whom he states ". . .where [sic] there and will testify to this they are all witnesses to the fact that we were either sprayed or misted with week killer. . . ." Plaintiff adds: "McNut showed very unprofessional action with his safety or with the safety and well-being of each and every person that he either sprayed or exposed." Plaintiff does not provide any declarations from these witnesses.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard for summary judgment and summary adjudication is the same. See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998). One

of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.
>
> Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987). To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted). It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.

1   In resolving the summary judgment motion, the court examines the pleadings,
2   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if
3   any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see
4   Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed
5   before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.
6   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to
7   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen
8   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.
9   1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for
10  the judge, not whether there is literally no evidence, but whether there is any upon which a jury
11  could properly proceed to find a verdict for the party producing it, upon whom the onus of proof
12  is imposed."  Anderson, 477 U.S. at 251.

### III.  DISCUSSION

15  Defendants argue that the undisputed evidence establishes: (1) McNut did not
16  violate any of plaintiff's constitutional rights; and (2) as to the remaining defendants, none were
17  deliberately indifferent to plaintiff's medical needs.
18  The court addresses McNut first, and agrees with defendants.  The treatment a
19  prisoner receives in prison and the conditions under which the prisoner is confined are subject to
20  scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment.  See
21  Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994).
22  The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized
23  standards, humanity, and decency."  Estelle v. Gamble, 429 U.S. 97, 102 (1976).  Conditions of
24  confinement may, however, be harsh and restrictive.  See Rhodes v. Chapman, 452 U.S. 337, 347
25  (1981).  Nonetheless, prison officials must provide prisoners with "food, clothing, shelter,
26  sanitation, medical care, and personal safety."  Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th

Cir. 1986). A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm. See Farmer, 511 U.S. at 834. Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind." See id.

At most, defendant McNut was negligent in his use of Roundup on July 31, 2006. There is simply no evidence that McNut acted deliberately and with the purpose of inflicting harm on plaintiff. To the contrary, the undisputed evidence shows that McNut realized the potential for exposure and acted to avoid that risk by adjusting the nozzle and changing the direction of the spray. Plaintiff's statement that various witnesses will testify that McNut acted "unprofessionally" does not create a genuine dispute as to a material fact because plaintiff has not provided any actual declarations or witness testimony. Moreover, even assuming he did, allegedly unprofessional conduct, without further elaboration, does not rise to the level of deliberate indifference.

Turning to the remaining defendants, plaintiff claims that they violated his rights with respect to his health care following the July 31, 2006 incident. Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, also gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837. This applies to physical as well as dental and mental health needs. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982). An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is

chronic and accompanied by substantial pain.  See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns.  See McGuckin, 974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989).  The complete denial of medical attention may constitute deliberate indifference.  See Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986).  Delay in providing medical treatment, or interference with medical treatment, may also constitute deliberate indifference.  See Lopez, 203 F.3d at 1131.  Where delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury.  See McGuckin, 974 F.2d at 1060.

Negligence in diagnosing or treating a medical condition does not, however, give rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a difference of opinion between the prisoner and medical providers concerning the appropriate course of treatment does not give rise to an Eighth Amendment claim.  See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

Here, the undisputed evidence shows that, contrary to plaintiff's assertion of deliberate indifference, plaintiff received regular medical treatment.  Upon learning that plaintiff was complaining of adverse health effects due to Roundup exposure, defendant Wooten escorted plaintiff to the medical clinic.  Wooten's off-the-cuff remark about his own experience with Roundup was not intended to suggest that plaintiff need not receive medical care.  Defendant Riley for his part provided the medical clinic with the safety information for Roundup.  Further, the undisputed evidence shows that defendants Roche, Pomazal, and Reichert each provided plaintiff with medical attention following the July 31, 2006, incident.  Specifically, Roche examined plaintiff on August 2, 2006, August 23, 2006, and December 13, 2006; Pomazal

examined plaintiff's medical records and history in connection with each of his grievances; and Reichert interviewed plaintiff in connection with his fifth grievance.

Defendants have presented ample evidence showing that plaintiff received extensive medical care and follow-up treatment following the July 31, 2006, incident. Plaintiff has not presented any evidence to create a genuine dispute as to this point and, thus, cannot establish the necessary element of his Eighth Amendment medical care claim that defendants were deliberately indifferent.

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that defendants' motion for summary judgment (Doc. 54) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  September 12, 2013

                                                               **CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE